IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

PETER NEWMAN : Case No: **3:17 cv 179**
594 Garden Road
Dayton, OH 45419 : **THOMAS M. ROSE**

      Plaintiff :

   v. :

UNIVERSITY OF DAYTON : **COMPLAINT AND JURY DEMAND**
Acme Agent, Inc.
41 S. High Street, Suite 2800 :
Columbus, OH 45469,

       :

CAROLYN PHELPS
Associate Provost for Faculty :
and Academic Affairs, and Deputy
Title IX Coordinator :
University of Dayton
St. Mary's Hall, Room 212 :
300 College Park
Dayton, OH 45469-1624, :

KIMBERLY BAKOTA
Title IX/Civil Rights Investigator :
University of Dayton
St. Mary's Hall, Room 300 :
300 College Park
Dayton, OH 45469-1624, :

CHRISTINE SCHRAMM :
Associate Vice President for Student
Development, Dean of Students, and :
Deputy Title IX Coordinator
University of Dayton :
Gosiger Hall, Room 202
300 College Park :
Dayton, OH 45469

FILED
RICHARD W. NAGEL
CLERK OF COURT
2017 MAY 19 AM 11: 29
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIST. AT DAYTON

TERENCE LAU                    :
Associate Dean of the School of
Business Administration and Professor   :
University of Dayton
Miriam Hall, Room 230           :
300 College Park
Dayton, OH 45469,               :

JAY JANNEY                     :
Chair of the Management and Marketing
Department and Associate Professor   :
University of Dayton
Miriam Hall, Room 706           :
300 College Park
Dayton, OH 45469,               :

E.  JAMES DUNNE               :
Interim Dean of the School of
Business Administration and Professor   :
University of Dayton
Miriam Hall, Room              :
Dayton, OH 45469,

                             :
ERIC SPINA
President                       :
University of Dayton
Office of the President         :
St. Mary's Hall, Room 207
3oo College Park             :
Dayton, OH 45469-1624

                             :
ANDREW STRAUSS
Dean                          :
University of Dayton School of Law
Keller Hall                   :
300 College Park
Dayton, OH 45469-2772,          :

**BRIDGET JACKSON**　　　　　　　　　　　：
**University of Dayton School of Law**
**Keller Hall**　　　　　　　　　　　　　：
**300 College Park**
**Dayton, OH 45469 - 2772,**　　　　　　：

**AMY ZAVADIL**　　　　　　　　　　　：
**Title IX/Section 504 Coordinator**
**University of Dayton**　　　　　　　　：
**Title IX/Section 504**
**& Equity Compliance**　　　　：
**St. Mary's Hall, Room 300**
**300 College Park**　　　　　　　　　：
**Dayton, OH 45469-1641, and**

　　　　　　　　　　　　　　　　　　：

**MARY ANN RECKER**
**General Counsel**　　　　　　　　　　：
**University of Dayton**
**Office of Legal Affairs**　　　　：
**300 College Park**
**Dayton, OH 45469-1660,**　　　　　　：

　　　　　　　**Defendants.**　　　　：

Plaintiff, Peter Newman, for his Complaint against the University of Dayton ("UD" or "University"), Carolyn Phelps, Kimberly Bakota, Christine Schramm, Terence Lau, Jay Janney, E. James Dunne, Eric Spina, Andrew Strauss, Bridget Jackson, Amy Zavadil, and Mary Ann Recker alleges as follows:

## SUMMARY OF THE CASE

1.　　　Plaintiff worked as an Adjunct Professor at UD from 2014 to 2017. He taught Corporate Compliance, Risk Management and Ethics at the School of Law, Advanced Business Law for Accountants in UD's MBA Program, and The Legal and Ethical Environment of Business ("Business Law") at the School of Business Administration (SBA).

2.　　　Plaintiff's students gave him excellent evaluations and his colleagues in the SBA complimented him on his teaching skills. Prior to Plaintiff's filing a discrimination and harassment complaint against a female African American law student, UD had not taken any disciplinary action against Plaintiff.

3

3.      On September 16, 2016, Plaintiff filed an internal discrimination and harassment complaint against a female African American law student - Bridget Jackson - with Interim Title IX Coordinator Kimberly Bakota.

4.      Subsequently, UD, through its employees, engaged in a pattern of retaliation taking adverse actions against the Plaintiff each time he engaged in protected conduct which ultimately lead to the termination of Plaintiff's teaching career at UD and UD banning him from visiting its campus.

5.      In retaliation for Plaintiff's filing of his complaint against Jackson and for complaining about Interim Title IX Coordinator's inadequate investigation of his complaint, UD, through its employees, placed an unnecessary mutual contact order on him, did not renew his teaching contract for the Spring, 2017 Semester, took down his UD Community Profile from UD's Porches email website after it had been posted for a very short period of time, issued him two disciplinary warnings that were based on false accusations that Plaintiff had engaged in inappropriate behavior, and told him that the decision not to renew his teaching contract for the Spring would not be reconsidered.

6.      In retaliation for Plaintiff's asking UD to mediate his retaliation, discrimination, and harassment claims, UD, through its employees, instructed Professor Brian LaDuca not to move forward with developing a proposed new course with Plaintiff even though UD President Eric Spina had requested LaDuca to work with Plaintiff on this course, informed Plaintiff that there would not be a teaching position for him either during the Summer or Fall, told Plaintiff that "since your time at UD had come to an end" to remove his personal belongings from the adjunct professor office and to turn in his keys, withdrew a previous offer to act as a positive reference for Plaintiff if he decided to pursue teaching opportunities at other educational institutions, kicked him out of the law library, and Law School Dean Strauss banned Plaintiff from visiting the law building until after Jackson graduates and finishes studying for the Summer bar exam.

7.      In retaliation for Plaintiff's filing an internal retaliation complaint with new Title IX Coordinator Amy Zavadil and asking her to remove Dean Strauss' unnecessary and retaliatory ban, UD, though its employees, dismissed Plaintiff's retaliation claim without investigating it, refused to remove Dean Strauss' ban,  and treated Plaintiff less favorably than similarly situated former employees and former students by deactivating his UD gmail account while permitting former employees and former students who had not engaged in protected activities, like Plaintiff, to keep their UD gmail accounts.

8.      In retaliation for filing administrative charges and an administrative complaint, UD, through its employees, denied a request that Plaintiff be paid a $5,000 stipend which he had been promised for working as a Research Fellow on a Forced Labor Project, did not  approve paying Plaintiff a $50 stipend he had been promised for attending an adjunct faculty teaching workshop, and banned Plaintiff from visiting UD's campus.

9.      In addition to retaliating against Plaintiff, UD, through its employees discriminated against Plaintiff based on his age by not renewing his teaching contract for the Spring, 2017 Semester and

then replacing him with a younger in-house counsel who had never taught the business course before compared with Plaintiff who had taught this course ten times.

10.     UD, though its employees, unlawfully denied Plaintiff public accommodations in violation of the Ohio Civil Rights Act when it kicked him out of the law library, banned him from visiting the law building until after Jackson finishes studying for the Summer bar exam, and deactivated his UD gmail account.

11.     By retaliating against Plaintiff, discriminating against him because of his age, and by denying him public accommodations, the individual defendants have aided and abetted the doing of acts declared to be unlawful discriminatory practices under the Ohio Civil Rights Act.

12.     Plaintiff has Title IX claims against UD, former Interim Title IX Coordinator Bakota, current Title IX Coordinator Zavadil, and other Defendants for sex discrimination, erroneous outcome, deliberate indifference, harassment, and negligence.

13.     Plaintiff has Ohio wrongful discharge claims against UD for promissory estoppel and breach of an implied contract.

14.     Finally, Plaintiff has tort claims for negligence *per se* against Bakota and for misrepresentation and fraud against UD.


## THE PARTIES

15.     UD is a private Roman Catholic university that was founded in 1850 by the Society of Mary (Marianists). The University has about 8,000 undergraduate and 2,200 post-graduate students.

16.     Carolyn Phelps is Associate Provost for Faculty and Administrative Affairs and Deputy Title IX Coordinator. In addition, Phelps is a member of the 2016-2017 cohort of the Marianist Educational Associates ("MEAs"), an initiative among the three Marianist Universities ( UD, St. Mary's University, and Chaminade University) to build strong partners with members of the Society of Mary. MEAs participate in an initial foundation retreat and then meet once a month from September to May to continue their formation by developing, strengthening, and advancing the Catholic and Marianist philosophy of education.

17      Christine Schramm is Associate Vice President for Student Development, Dean of Students, and Deputy Title IX Coordinator. She was a member of the 2012-201 cohort of MEAs.

18.     Kimberly Bokata is UD's former Interim Title IX/Section 504 Coordinator.

19.     Terence Lau is Associate Dean and Professor at the UD's School of Business Administration ("SBA").

5

20.     Jay Janney is Chair of the Management & Marketing Department at UD's SBA.

21.     E. James Dunne is the Interim Dean of UD's SBA.

22.     Eric Spina is UD's President.

25.     Andrew Strauss is the Dean of UD's School of Law.

26.     Bridget Jackson is the law student from Plaintiff's Corporate Compliance, Risk Management & Ethics class against whom he filed his discrimination and harassment complaint.

27.     Mary Ann Reeker is UD's General Counsel.

## JURISDICTION AND VENUE

28.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

29.     Venue is proper under 28 U.S.C. §1391(b)(1)(2).

## STATEMENT OF FACTS

**UD's Governing Policies and Procedures:**

30.     Attached are copies of UD's policies and procedures that are relevant to Plaintiff's claims:

Nondiscrimination and Anti-harassment Policy

Mandatory Reporting Policy

How the University of Dayton Equity Complaint Process Works

Equity Complaint Process in Detail

Frequently Asked Questions

**Facts regarding Plaintiff's claims that Defendants retaliated against him for filing his discrimination and harassment complaint against Jackson and for questioning Bakota's inadequate investigation of his complaint, Defendant Bakota defamed Plaintiff, and Defendants discriminated against Plaintiff based on his age.**

31.     In April, 2016, Plaintiff ran into two law students (Sarah Oakley and Bridget Jackson) sitting in the atrium of the law building (Keller Hall). Plaintiff introduced myself, explained that he was teaching Corporate Compliance, and urged them to sign up for his class because Corporate Compliance was a growing field with many job opportunities. Oakley said that she had already signed up for Plaintiff's class and suggested to Jackson that she take the class as well. After Plaintiff explained his course further, I Jackson said that she would sign up for the class.

32.     Plaintiff's Corporate Compliance, Risk Management and Ethics class was an 8-week class that began on May 9, 2016, and met on Tuesdays, Thursdays, and Fridays from 9:40-11:40 a.m.

33.     Although Plaintiff had invited Jackson to take his class, she became increasingly disrespectful and disruptive in class. Jackson targeted Plaintiff because he is male, white, and over 40 years old.

34.     Plaintiff's problems with Jackson began on May 19, 2017 when she disrespected Plaintiff, disrupted his class, and then bad mouthed him to another student. Plaintiff assigned the students a project regarding their companies' codes of conduct. Plaintiff asked the students to obtain a copy of their company's code of conduct, compare it with the code of conduct of one of their competitors, and then identify 5 risk areas that their company's code needed to address. Immediately after Plaintiff explained this assignment, Jackson spoke out in front of the rest of the class stating that she did not understand the assignment. In response, Plaintiff suggested to Jackson that she reread the assignment, start working on it, and if she was still having problems to contact him. Jackson shot back that Plaintiff obviously did not want to help her and then proceeded to walk out of the classroom. Plaintiff stopped Jackson explaining that no one in my class gets to "cop an an attitude." Plaintiff then once again suggested to Jackson that she reread the assignment, start working on it, and if she was still having problems to contact me. That evening, Jackson called Erin Dupree, one of her white classmates, to badmouth Plaintiff claiming that Plaintiff had disrespected her in front of the class. Dupree corrected Jackson pointing out that in fact she had disrespected Plaintiff and owed him an apology.

35.     The second time Jackson disrespected Plaintiff and disrupted his class was on May 27, 2016. At the end of class, Josh Pammer asked if Plaintiff could give the students an extension on the Friday midnight deadline for that week's writing assignment. Plaintiff agreed to Pammer's request on the condition that the students do a better job on that week's assignment than they had done on the previous week's assignment. At this point Jackson shouted out a question: "can you drop that stupid book review assignment?" In response, Plaintiff told Jackson that he would answer her question but that he had a question for her to answer first. Plaintiff then asked if Jackson had ever asked another law professor to drop an assignment that she considered to be "stupid"? Jackson said "no" and then mumbled something under breath about no other professor assigning as many written assignments as Plaintiff did. Plaintiff ended this exchange by telling Jackson that he would not drop the book review assignment because it was a crucial part of his lessons for Business Ethics Week.

36.    The third time Jackson disrespected me and disrupted my class was on June 9, 2016. At the start of class I had planned on distributing the graded midterm exams and then going over the midterm with the class. Overall I was disappointed with the students' performance because          even though the midterm was worth 200 points, I had to give a 50-point curve to get a satisfactory bell curve of grades. Because UD uses blind grading, I did not know the students' scores before distributing the midterms. As soon as Bridget received her midterm, she started to shout and curse. She said "I can't believe I got a C - of this goddamned exam." She went on to exclaim that the class and the professor were "bullshit." At this point I tried to intervene suggesting that because Bridget had issues with the class and me, it would be better if we talked privately outside of class so that we did not waste the other students' time. Bridget refused to be quiet and refused to return her graded midterm which the law school required her to do.  At the end of her outburst, Bridget announced that she was going to the Dean's office to "fix things" and then stormed out of the classroom.

37.    Subsequently, several of Bridget's classmates (Erin Dupree, Sarah Oakley, and Mary Power Klein) told me that they were both surprised and embarrassed by Jackson's disrespectful conduct toward me. They also said that they had been in other classes with Bridget that were taught by female, African American, and younger professors and that Bridget had not acted towards them in the same way in which she had acted towards me.

38.    Although Plaintiff reported Jackson's misconduct to Dean Thaddeus Hoffmeister (Plaintiff's supervisor) and to Adjunct Faculty Advisor Judge Mary Kate Huffman, neither of them took any disciplinary action against Jackson. Instead, Jackson was permitted to drop my class and was refunded the money she paid for my course.

39.    After giving Jackson's mistreatment of him much thought and disregarding his fears about UD retaliating against him, on September 16, 2016 Plaintiff filed a discrimination and harassment complaint against Jackson with Interim Title IX/Section 504 Coordinator Kim Bakota. Plaintiff told Bakota about the three times Jackson had disrespected him and had disrupted his class and said that he thought that Jackson had discriminated against him and harassed him because of his sex, race, and age. Plaintiff also provided Bakota with the names of the students who had told him that Jackson had treated him less favorably than similarly situated female, African American, and younger professors at UD (e.g. Professor Vernellia Randall).

40.    In response to Jackson's request, Bakota issued a mutual no contact letter on September 26, 2016.

41.    Because Plaintiff was dissatisfied with Bakota's delay in investigating his complaint, Plaintiff requested a meeting with Dean of Students Kristine Schramm. Almost immediately after Plaintiff made this request , Bakota send Plaintiff an email message dated September 29, 2016 stating: "This email is to inform you that the initial investigation is complete. The initial investigation into your complaint revealed that the allegations cannot support a finding that the University's Nondiscrimination and Anti-Harassment policy was violated. Consequently, the case will be closed with no further action from the Equity Compliance Office."

42.     To support her erroneous conclusion, Bakota sent an October 3, 2016 email message to Schramm and Debra Monk, Associate Dean of Students and Director of Community Standards for Civility.

In this memo Bakota stated that there were no facts to suggest that any of Jackson's actions stemmed from sex, age, or race-based animus. Bakota also stated that Plaintiff's comments made to her during their September 16 meeting (the student was experiencing a "N moment" in his class; the student played the race card; and that the student would be failing her race if she didn't do her best) suggested that any perceived race-based animus may have originated with Plaintiff, not Jackson. Plaintiff did object to Jackson's request for a mutual no contact order because he felt that Jackson was playing a race card in order to falsely portray herself as the victim when the reality was that Jackson was the perpetrator of the discrimination and harassment. Plaintiff did not make the other two racist remarks that Bakota attributed to him.

43.     On October 11, 2016,  Schramm and Bakota met with Plaintiff on October 11, 2016. Schramm also invited Carolyn Phelps, Associate Provost for Faculty and Academic Affairs to attend this meeting. Plaintiff started the meeting by presenting a brief summary of the three times Jackson had disrespected me and disrupted my class. To help them empathize with how Jackson's misconduct had made me feel, I referred to Yale Sociology Professor Elijah Anderson's  January 26,2016 speech at UD. I told Schramm, Bakota, and Phelps that I felt that I was having  moments of acute disrespect each time Jackson had disrespected me in front of my class. Schramm then delivered three terse messages to Plaintiff : (1.) he did not need to question whether UD officials had done their jobs because they had done their jobs; (2.) he may have a different sense of justice than we do, but we have our own rules and regulations we have

to follow; and (3.) he has to understand that we are dealing with a different type of

student today and the University cannot make them apologize for misbehaving in class. Schramm then turned the meeting over to Bakota. Bakota stated that the reason she had found no merit to Plaintiff's complaint was because he had offered no evidence of any comparators. However, Bokata agreed that Plaintiff had told her about Jackson's admission she had never asked another professor to drop an assignment she considered "stupid"  and that this was comparator evidence. Bakota also admitted that she had not interviewed the three law students Plaintiff had identified as my witnesses who could support his complaint. The meeting ended with Phelps saying that she empathized with Plaintiff's situation. Although Phelps said that in a perfect world I should have called Jackson outside of class and talked with her, she understood that on June 19, Jackson walked out of my class and, consequently, prevented me from talking with her.

44.     After the October 11 meeting,  Phelps, Schramm, and Bakota concluded that Plaintiff was "problem faculty".

45.     Shortly after this October 11 meeting, Plaintiff talked with his friend Paul Vanderburg who is also an Associate Provost. When Plaintiff asked Vanderburg why Schramm had invited Phelps to attend the meeting, Vanderburg explained that Phelps is in charge of "problem faculty." Vanderburg warned Plaintiff against being labeled as "problem faculty" because if you do, Phelps will take steps to get rid of you.

46.     On October 14, 2016 - three days after the October 11 meeting - Jay Janney, Chair of the Management and Marketing Department came down to Plaintiff's office and said that he had "some bad news" for him. Janney then informed Plaintiff that "the decision had been made not to schedule [him] to teach in the Spring." When Plaintiff asked Jay why he was not being scheduled, Janney explained that "ever since he became Department Chair, we have been moving towards using more professional staff [in-house counsel] to teach Business Law so that they can get to know us better." Janney then told Plaintiff that he was replacing him with in-house counsel Matt Willenbrink. When Plaintiff asked Janney if there were any other classes he could teach, Janney said "no."

47.     Four days later on October 18, 2016, the Marketing and Communications Department suspiciously took down Plaintiff's UD Community Profile from the Porches email website after it was posted for a very short time. Shannon Miller had previously notified Plaintiff that his profile was posted at approximately 3:30 p.m. on Monday, October 17. However, when Plaintiff checked at noon the next day, his profile was replaced with Jana Bennett's profile. Plaintiff felt this was suspicious because he was aware that the profiles of others (e.g. John Ruggiero) had been posted for weeks.

48.     On October 24, 2016, Plaintiff met with Janney and asked him to reconsider the decision not to schedule him to teach in the Spring. In response, Janney said that he "would think about it."

49.     On November 9, 2016 Jim Dunne, Interim Dean of the School of Business Administration and Phelps called Plaintiff into a hastily scheduled meeting during which they falsely accused me of engaging in four alleged incidents of inappropriate behavior in response to Janney's decision not to schedule him to teach in the Spring. Although Plaintiff denied these allegations, Dunne and Phelps nevertheless warned Plaintiff that if he did not stop engaging in inappropriate behavior, he would be immediately removed from his two MGT 201 classes.

50.     On Saturday, November 12, 2016, Dunne sent Plaintiff a draft memo summarizing the November 9 meeting and asked Plaintiff to let him know if I believe the memo contains any inaccuracies. Dunne copied Phelps on hi message.

51.     The next morning Plaintiff responded to Dunne's message explaining that because he had gotten extremely busy with his classes and law practice, he would not be able to respond to his message until later that week.

52.     On Monday, November 14, 2016, Dunne sent Plaintiff an email message falsely accusing him of engaging in two new alleged incidents of inappropriate behavior without first giving Plaintiff an opportunity to defend myself. Dunne copied Phelps and Janney on his message. Significantly, Dunne also copied UD General Counsel Mary Ann Recker.

53.     Because Dunne copied Janney on this message, Janney was mislead into believing that Plaintiff had violated Dunne and Phelps' November 9 warning when in fact he had not. Within a few hours after Plaintiff received Dunne's message, Janney sent Plaintiff a message stating that he "could not imagine any scenario" in which he would reconsider the decision not to hire Plaintiff for the Spring, 2017 Semester.

**Facts regarding Plaintiff's claims that Defendants retaliated against him for requesting mediation of his claims and denied him a public accommodation by kicking him out of the law library and then banning him from visiting the law building.**

54.     On December 5, 2016 met with Troy Washington, Vice President for Human Resources and asked the University to mediate my claims. Washington was receptive to the idea and said he would check with the Provost's Office.

55.     On December 9, 2017 Washington told Plaintiff that he had spoken to Phelps and Dunne about my request for mediation and they said that they were not interested. That same day Phelps called Brian DeLuca, Director, Institute of Applied Creativity for Transformation (IACT) at ArtStreet and instructed him not to move forward with the proposed Designing Your Life (DYL) class which President Eric Spina had asked DeLuca and Plaintiff to develop. According to DeLuca, Phelps explained that she gave this instruction because of Plaintiff's "ongoing dealings with the University."

56.     On December 14, 1016, Provost Paul Benson rejected Plaintiff's request for mediation.

57.     On December 15, President Spina rejected Plaintiff's request for mediation.

58.     On December 30, 2016 Plaintiff sent Janney an email message offering to help him address two issues regarding the Spring, 2016 teaching schedule for the MGT 201 classes.
In his response, Janney not only rejected Plaintiff's offer but also informed Plaintiff that he would not have a position for him for either the Summer or the Fall. Janney then stated that "since your time with UD has come to an end," it was time for me to remove my personal belongings from the adjunct faculty office and to turn in my keys.

59.     After Plaintiff asked Janney how he could know that he did not have a position for him for either the Summer or the Fall semesters before students registered for classes for those semesters, Janney withdrew the offer he had previously made to Plaintiff on October 14 to serve as a positive reference for Plaintiff if he wanted pursue teaching opportunities at other colleges and universities.

60.     On January 10, 2017, Plaintiff was doing research in the Zimmerman Law Library at UD. According to UD's position regarding Plaintiff's OCRC employment discrimination charge, Bridget Jackson "reportedly knew that [Plaintiff ] was in the building and was uncomfortable with his presence in the building." After Jackson spoke with Associate Dean Lori Shaw, Shaw in turn told Susan Elliott, the Library Director, to ask me to immediately leave the law library. When I asked Elliot why I was being asked to leave, she said that I "would have to take it up with the Dean's Office." After I was unable to reach
Law School Dean Strauss by telephone, I sent an email to General Counsel Recker asking for an explanation for this outrageous and embarrassing action. Recker in turn forwarded my request to Dean Strauss.

61.     In his January 12, 2017 email response, Strauss said that Plaintiff had been asked asked to leave because of the mutual no contact letter which Interim Title IX Coordinator Bakota had issued in connection with her investigation of Plaintiff's complaint against  Jackson. Although Bakota had informed Plaintiff on September 29, 2016 that she had finished her investigation of Plaintiff's complaint and        that "this case would be closed with no further action from her office",  Dean Strauss
nevertheless relied on the interim mutual no contact order which Bakota had issued in connection with her now closed investigation to not only ban Plaintiff from using the law library but also from even visiting Keller Hall (the law school building) until after Jackson graduates and finishes studying for the Summer bar exam.

**Facts regarding Plaintiff's claims that Defendants retaliated against him for filing an internal retaliation complaint with Title IX/Section 504 Coordinator Amy Zavadil and for asking her to remove Law School Dean's unnecessary and retaliatory ban and that Defendants denied him public accommodations by deactivating his UD gmail and banning him from visiting UD's campus**

62.     On January 18 and 19, 2017, Plaintiff sent two email messages to new Title IX/Section 504 Coordinator Zavadil asking her do two things. First, investigate his new internal retaliation complaint. Second, immediately remove Dean Strauss' unnecessary and retaliatory ban. In support of these requests,  Plaintiff attached several email messages he had received from UD employees.

63.     The next day, UDit sent Plaintiff an email message stating that his UD gmail account was going to be deactivated effective February 3, 2017. Zavadil also emailed her initial response to Plaintiff's two requests. In response to Plaintiff's request that she investigate his new retaliation complaint, Zavadil said that she would "review the records of the interactions you note in this complaint." Regarding Plaintiff's request that she remove Dean Strauss' ban, Zavadil rejected Plaintiff's request. Zavadil said: "In the meantime, the no-contact directive issued in September … and the recent message from Dean Strauss indicating that honoring the no-contact directive includes restricting your access to Keller Hall, remain in effect. It is, in fact, standard for no-contact directives to be put in or remain in place following equity inquiries or investigations, as a right afforded to complainants and respondents in the UD process."

64.     On January 26, 2017, Zavadil sent her final response to Plaintiff's two requests. Regarding his new retaliation complaint, Zavadil did not investigate Plaintiff's complaint but, instead, summarily dismissed it : "As to the other attachments you provided regarding your role as an adjunct, that matter is unrelated to the nondiscrimination complaint from September." Regarding Plaintiff's request that she remove Dean Strauss' ban, Zavadil once again refused to lift the ban. Instead, Zavadil tried to defend it: "In reviewing the records regarding the outcome from Fall 2016 and related no-contact directive, it seems that the restriction of your access to Keller Hall and the law library is in recognition of the student's right to access those areas as part of ongoing access to her educational program and related resources without risk of interaction in conflict with the no contact directive.  There does not appear to be any indication of this action as separate from the stated outcome remedy of that closed case."

65.     Because Plaintiff could not get access to his UD gmail, on January 31, 2017 he went to the UDit Help Desk to get his problem fixed. While there, Plaintiff ran into former UD Football Coach George Perles who has not had any affiliation with UD for many years. Pereles told Plaintiff that he was also there to get help on his UD gmail account.

66.     On February 14, 2017 Plaintiff exchanged email messages with Tom Skill, Associate Provost & CIO. Skill explained that the reason Plaintiff could not get access to his UD gmail account was due to his separation from employment with the University. He also said that UDit had sent Plaintiff an email on January 20 stating that his gmail account would be deactivated on February 3. According to Skill, Plaintiff's account was deactivated according to UD's "standard practice."
In response, Plaintiff told Skill that he had several problems with his message. First, Plaintiff told Skill that he did not recall receiving UDit's message. Second, Plaintiff explained that even though he was not teaching this semester, he nevertheless still needed to use his UD gmail to communicate with other professors and students with whom he was working on ongoing projects. Third, Plaintiff told Skill that he suspected that what really triggered UD's decision to deactivate his UD gmail was that he had recently filed a complaint against UD with the Department of Education office for Civil Rights (ORC). Plaintiff asked Skill to reactivate my UD gmail account.

67.     The next day, Mary Ann Recker, UD General Counsel, sent Plaintiff an email message about his email exchange with Skill. She said: "Standard protocol is for the University to discontinue email accounts for employees and students no longer working or enrolled at the University. The University has made exceptions in the past for certain individuals, but that is on a case-by-case basis. The University will not be deviating from its standard protocol for you." Reeker also stated that, prior to my mentioning my OCR complaint to Skill, the University was not aware of my complaint.
In his reply, Plaintiff told Recker that although UD officials may not have been aware of his OCR complaint before they deactivated his UD gmail account, UD officials were aware of his internal retaliation complaint

which he had filed with Title IX/Section 504 Coordinator Zavadil on January 19 and 20. Plaintiff then went on to explain that he could establish a prima facie case of retaliation and could prove that UD's articulated reason for deactivating my UD gmail account was a pretext. Finally Plaintiff told Recker that unlike former Coach Pereles and other terminated employees, he needed his UD gmail to communicate with professors and students with whom he was working on ongoing projects.

68.     To support his argument that he had extenuating circumstances that warranted his continued use of his UD gmail, Plaintiff forwarded to Recker messages he had received from two of his former students: Kristine Perez's message asking if Plaintiff could still submit a dental school recommendation for her and Elise Zielinski's message asking if Plaintiff could fill out a faculty recommendation form, "if UD will let you", so she could become a paid tutor for the MGT 201 classes.
Recker never responded to these messages.

**Facts regarding Plaintiff's claims that Defendants retaliated against him for filing his administrative charges and complaint by refusing to pay him two promised stipends he had earned and denied him a public accommodation by banning him from visiting UD's campus.**

69.     On January 20, 2017 Plaintiff filed a complaint against UD with the Department of Education Office for Civil Rights (ORC). On February 14, 2017, Plaintiff filed his EEOC charge against UD.
On February 28, 2017 Plaintiff filed his employment discrimination charge against UD with the OCRC.
Finally on March 1, 2017 Plaintiff filed my denial of public accommodations charge against UD with the OCRC.

70.     On March 8, 2017 - seven days after Plaintiff filed his last administrative charge - Associate Provost Phelps denied Professor Mark Ensalaco's request that Plaintiff be paid his $5,000 stipend which Ensalaco had promised to pay Plaintiff for working as a Research Fellow on the Forced Labor Project.

71.     On May 15, 2017 - seven days after blocking payment of the Forced Labor Project stipend - Phelps denied approval for paying Plaintiff a $50 stipend for his attending a Learning Teacher Center workshop held on February 22, 2017.

72.     The next day Plaintiff sent a demand letter to Phelps asking her to pay him the two stipends. Phelps responded that she had referred Plaintiff's demand letter to General Counsel Reeker.

73.     In her March 21, 2017 email reply to Plaintiff's demand letter, Recker incorrectly tried to shift the blame for UD's refusal to pay his two stipends from UD to Plaintiff. Recker then stated that UD would pay Plaintiff the $50 stipend but only $300 for his work on the Forced Labor Project. Because Recker knew that Plaintiff had asked

Ensalsco to pay his stipend in a lump sum so that he could pay for a new furnace that had just been installed in his home, she then tried to buy off Plaintiff with a nuisance settlement offer: "The University is willing to offer additional consideration in the amount of $1,650 (for a total of $2,000) in exchange for a full release of claims against the University and other considerations." Recker closed her response by banning Plaintiff from UD's campus. Recker stated: "Accordingly, and particularly since you no longer have any association with the University and therefore have no valid reason to be on University property, the University asks that you no longer visit the University of Dayton campus." Recker's assertion that Plaintiff "has no valid reason to be on University property" is incorrect because every Sunday he attends mass at the Immaculate Conception Chapel located on UD's campus. It is sadly ironic that UD, a Catholic University that touts its "Commitment to Community" would violate a community member's First Amendment right to attend mass at its campus chapel.

74.     Less than two months after Recker made her nuisance settlement offer to Plaintiff, UD officials announced that the University will spend $72 million to renovate UD Arena.

## FIRST CAUSE OF ACTION
### Retaliation in violation of Title VII, Title IX, and the Ohio Civil Rights Act
### (Against Defendants UD, Kimberly Bakota, and Amy Zavadil)

75.     Plaintiff realleges and incorporates all of the allegations in the preceding paragraphs of this Complaint as if fully rewritten herein.

76.     Title VII, Title IX, and the Ohio Civil Rights Act each protect individuals who engage in protected activities from retaliation.

77.     Retaliation claims under Title VII, Title IX, and the Ohio Civil Rights Act are analyzed using the same standards as Title VII retaliation claims. In order to establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) this activity was known to the defendant; (3) the defendant, thereafter, took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse action. In the instant case, Plaintiff can establish all of these elements.

78.     Regarding the first element, Plaintiff engaged in protected activities when he filed his internal discrimination and harassment complaint against Jackson with Interim Title IX Coordinator Bakota, asked Vice President for Human Resources Washington if UD would mediate his claims, filed an internal retaliation complaint with Interim Coordinator Zavadil and asked her to remove the ban that Law School Dean Strauss had placed on him, and filed his discrimination charges with the EEOC and the OCRC and his complaint with the OCR.

79.     Regarding the second element, Plaintiff can establish that UD's decision makers were aware of Plaintiff's complaint against Jackson under the "cat's paw" theory. Associate Dean Phelps - who had retaliatory animus against Plaintiff and whose job is to get rid of "problem Faculty" - influenced Janney's decision not to renew Plaintiff's teaching contract for the Spring, 2017 semester, Wilson's decision to take down Plaintiff's UD Proches Profile, Dunne's decision to give Plaintiff two meritless disciplinary warnings, and Janney's ultimate decision to terminate Plaintiff's teaching career at UD. Defendants had knowledge of Plaintiff's other protected activities because Plaintiff made his requests for mediation directly to Washington, Benson, and Spina, filed his internal retaliation complaint and his request that Dean Struss' ban be removed with Zavadil, and the EEOC, OCRC, and OCR notified Defendants that Plaintiff had filed his charges and complaint.

80.     Regarding the third element, Plaintiff can establish that after he engaged in his protected activities, Defendants took adverse actions against him that might well deter a reasonable employee from complaining about discrimination:

a.      In response to Plaintiff filing his internal discrimination and retaliation complaint against Jackson, Interim Title IX Coordinator Bakota responded so inadequately that her response manifests indifference or unreasonableness under the circumstances, Janney informed Plaintiff that the decision had been made not to schedule him to teach during the Spring, 2017 semester, Wilson took down Plaintiff's UD Community Profile after it was posted for only a short time, and Phelps and Dunne gave Plaintiff two disciplinary warnings that were based on false accusations that he had engaged in inappropriate behavior.

b.      In response to Plaintiff's requesting UD officials to mediate his claims, Phelps and Dunne rejected his mediation request, Phelps instructed LaDuca to stop working with Plaintiff on the proposed Designing Your Life course, Benson rejected Plaintiff's request for mediation, Spina rejected Plaintiff's request for mediation, Janney told Plaintiff that he would not have a teaching position for him either for the Summer or Fall, 2017, Janney terminated Plaintiff's employment, Janney withdrew his previous offer to serve as a positive reference for him, Elliott kicked Plaintiff out of the Zimmerman Law Library, and Dean Struss banned Plaintiff from using the law library and from visiting the law building until after Jackson finishes studying for the Summer bar exam.

c.      In response to Plaintiff's filing his internal retaliation complaint with Title IX Coordinator Zavadil and asking her to remove Dean Struss' ban, Zavadil did not investigate Plaintiff's complaint and she did not remove Dean Struss' ban, UD deactivated Plaintiff's UD gmail account, Skill denied Plaintiff's request to reactivate his UD gmail account claiming he was following "standard practice", Recker denied Plaintiff's request to reactivate his UD gmail account claiming that UD employees were following an alleged "standard protocol" and that Recker conceded that UD had made exceptions for individuals in the past, she said that UD would not make an exception for Plaintiff.

d.      In response to Plaintiff's filing his administrative charges and complaint, Phelps stopped UD from paying Plaintiff two stipends he had been promised and had earned, Recker supported Phelps' retaliatory actions, and Recker banned Plaintiff from visiting UD's campus.

81.      Regarding the fourth element, Plaintiff can establish a causal connection between his protected activities and Defendants' adverse actions based on convincing mosaics of different pieces of evidence showing causation:

a.      Plaintiff's convincing mosaic of evidence establishing a causal connection between his complaint against Jackson and Defendants' adverse actions consists of suspicious timing, UD's violating its own policy, and evidence that a comparator who did not engage in protected activity was treated better than Plaintiff. Just three days after Plaintiff's October 11, 2016 meeting with Phelps, Schramm and Bakota during which he questioned Bakota's inadequate investigation of his complaint against Jackson, Janney told Plaintiff that "the decision had been made not to schedule [him] to teach in the Spring." Sixteen days after President Spina rejected Plaintiff's request for mediation, the Provost Office submitted the Personnel Action Form (PAF) terminating Plaintiff's employment and Janney informed Plaintiff that his teaching career at UD was over. Brad Balser from the Registrar's Office told Plaintiff that Janney's decision to replace him with in-house counsel Matt Willenbrink and to schedule Willenbrink to teach a day class during his normal working hours violated UD policy. Finally as a result of Janney's alleged move to use more in house counsel to teach Business law, Plaintiff lost two classes whereas Tim Wood, a similarly situated outside adjunct professor who had not engaged in protected activity like Plaintiff, did not lose either of his two classes.

b.      Plaintiff's convincing mosaic of evidence showing a causal connection between his requests for mediation and Defendants' adverse actions consists of suspicious timing, the explanation Phelps gave LaDuca for instructing him to stop working with Plaintiff on the proposed Designing Your Life (DYL) course, Janney's angry response to Plaintiff's questioning how Janney could schedule for an uncertain future, and Dean Strauss's misplaced reliance on the mutual no contact issued in connection with the closed investigation of Plaintiff's complaint against Jackson to justify the ban he placed on Plaintiff. On December 9, 2016 - the same day that Washington told Plaintiff that Phelps and Dunne had rejected his request for mediation - Phelps called LaDuca and instructed him to stop working with Plaintiff on the proposed Designing Your Life course because of Plaintiff's "ongoing dealings with the University." After Benson and Spina rejected Plaintiff's requests for mediation on December 14 and 15, 2016 respectively, on January 1, 2017, Janney told Plaintiff that he would not have a teaching position for him during either the Summer or the Fall, 2017 and then terminated Plaintiff's employment. **After Plaintiff asked Janney how he could know that he did not have a position for him for either the Summer or the Fall semesters before students registered for classes for those semesters, Janney sent Plaintiff an angry response withdrawing his previous offer to serve as a positive reference for Plaintiff. Then, less than 30 days after Benson and Spina and rejected Plaintiff's**

requests for mediation, Elliott kicked Plaintiff out of the Zimmerman Law Library and Dean Strauss banned Plaintiff from using the law library and from visiting the law building until after Jackson finishes studying for the Summer bar exam. Despite Bakota's closing her investigation of Plaintiff's complaint against Jackson on September 29, 2016 and her subsequent refusal to take any additional action on Plaintiff's complaint, Dean Strauss nevertheless relied on the mutual contact order that Bakota had issued on September 26, 2016 - more than three and a half months earlier -to justify the ban he placed on Plaintiff.

      c.      Plaintiff's convincing mosaic of evidence showing a causal connection between the internal retaliation complaint he filed with Title IX Coordinator Zavadil and his request that she remove Dean Strauss' retaliatory and unnecessary ban consists of several pieces of evidence. Even though Janney told Plaintiff on October 14, 2016 that his teaching contract was not going to be renewed, UD had no problem with Plaintiff's continued use of his gmail account until he filed his internal retalaition complaint with Zavadil and attached several email messages he had received form other UD employees in support of his Complaint. Within a day or two after Plaintiff filed his complaint with Zavadil, UD's IT Department sent Plaintiff an email message stating that his UD gmail account was going to be deactivated. In addition, Zavadil's failure to investigate Plaintiff's complaint raises an inference of a causal connection.

      d.      Plaintiff's convincing mosaic of evidence showing a causal connection between his filing his administrative charges and complaint and Defendants' adverse actions consists of suspicious timing Recker's retaliatory explanation for banning Plaintiff from visiting UD's campus, and Recker ignoring information Plaintiff had provided to her about his valid reasons to be on UD's campus. The timing of Phelps' refusal to approve payment of two stipends Plaintiff had been promised and earned is suspicious because she acted shortly after Plaintiff had filed his two OCRC charges and his OCR complaint. In explaining her rationale for banning Plaintiff from visiting UD's campus, Reeker revealed her retaliatory motive. Recker said: "Finally, you have developed a pattern of visiting the University's campus and then transforming that time on campus into the basis of an unfounded complaint against the University. Such disruption cannot continue. Accordingly, and particularly since you no longer have any association with the University and therefore have no valid reason to be on University property, the University asks that you no longer visit the University of Dayton campus." An additional problem with Recker's explanation is that she ignored information that Plaintiff had previously given to her showing that he did have valid reasons to be on UD's campus. Recker's failure to take into account Plaintiff's valid reasons for being on campus is further proof of causation.

      82.      As a proximate result of Defendants' retaliation, Plaintiff has suffered damages for which he is entitled to all of the appropriate remedies available to him.

**SECOND CAUSE OF ACTION**

**Age discrimination in violation of the Age Discrimination in Employment Act (ADEA)**
**and Ohio Rev. Code Section 4112.02 (A)**

**(Against Defendant UD)**

83.     Plaintiff incorporates by reference Paragraphs 1-82 as if fully rewritten herein.

84.     Age discrimination claims under both the ADEA and Ohio Rev. Code Section 4112.02 (A) that are based on indirect evidence are analyzed using the *McDonnell Douglas/Burdine* shifting burden of production framework. The employee has the initial burden of establishing a prima facie case of age discrimination by showing that : (1) he was in the statutorily-protected age class; (2) he was discharged; (3) he was qualified for the position; and (4) his discharge permitted the employer to retain or hire a substantially younger person. If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. Finally, the burden shifts back to the employee to show that the employer's articulated reason is a pretext for age discrimination.

85.     Plaintiff can establish a prima facie case of age discrimination in this case because he is 61 years old, Mangement and Marketing Department Chair Janney did not renew Plaintiff's teaching contract for the Spring, 2017 semester and then later discharged Plaintiff from his Adjunct Professor position, he was qualified for the position, and Janney's discharge of Plaintiff permitted Janney to replace Plaintiff with a substantially younger person - Mathew Willenbrink.

86.     Janney's articulated reason for not renewing Plaintiff's teaching contract was that every since he became Chair of the department, "we have been moving towards using more professional staff to teach Business law."

87.     Janney's articulated reason is a pretext for age discrimination for several reasons. The timing of Janney's informing Plaintiff that the decision had been made not to schedule him to teach in the Spring is suspicious because it came just three days after Plaintiff attended a meeting during which he questioned Interim Title IX Coordinator Bakota's inadequate investigation of his complaint against Jackson. By scheduling Willenbrink to teach a Business law class during his normal work day, Janney violated UD's own policy. Janney changed the reason for the scheduling decision telling Plaintiff on October 24, 2016 that the reason he did not renew Plaintiff's teaching contract was because Plaintiff had turned in his grades for his Summer online Business Law Class in late. Willenbrink is less qualified than Plaintiff because he has never taught Business Law compared with Plaintiff who has taught this class ten times at UD. Finally, Janney treated Tim Wood, a similarly situated outside Adjunct Professor, better than Plaintiff because as a result of Janney moving towards using more professional staff to teach Business Law, Wood did not lose either of his two classes; Plaintiff lost both of his classes.

88.     As a proximate result of Janney's not renewing Plaintiff's teaching contract and then terminating his Adjunct professor position because of his age, Plaintiff has suffered damages for which

he is entitled to all of the appropriate remedies available to him.

## THIRD CAUSE OF ACTION
### Denial of public accommodations in violation of Ohio Rev. Code Sections 4112.02 (G) and (I)
### (Against Defendant UD)

89.     Plaintiff incorporates by reference Paragraphs 1-88 as if fully rewritten herein.

90.     Ohio Rev. Code Section 4112.02 provides, in pertinent part, that:

It shall be an unlawful discriminatory practice:

\*               \*               \*

(G)     For any … employee … or manager of a place of public accommodation to deny to any person, except for reasons alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation.

\*               \*               \*

(I)     For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

91.     In retaliation for Plaintiff's filing his discrimination and harassment complaint against Jackson, questioning Bakota's inadequate investigation of this complaint, and asking UD officials to mediate his claims, UD unlawfully denied Plaintiff public accommodations when Law School Dean Strauss' staff kicked Plaintiff out of the Zimmerman Law Library and Dean Strauss subsequently banned Plaintiff from using the law library and from visiting the law building until after Jackson, the law students against whom Plaintiff had filed his complaint, graduates and finishes studying for the Summer bar exam.

20

92.     In retaliation for Plaintiff's asking the University to mediate his retaliation and discrimination claims, filing a retaliation complaint with Title IX Coordinator Zavadil, and asking Zavadil to remove Dean Strauss' ban, UD unlawfully denied Plaintiff a public accommodation by deactivating Plaintiff's UD gmail account because it permitted similarly situated former employees and former students who had not engaged in protected activity to retain their UD gmail accounts.

93.     As a proximate result UD denying Plaintiff public accommodations, Plaintiff has suffered damages for which he is entitled to all of the appropriate remedies available to him.

## FOURTH CAUSE OF ACTION
### Aiding and abetting discrimination in violation of Ohio Rev. Code Section 4112.12 (J)
### (Against all of the Defendants)

94.     Plaintiff incorporates by reference Paragraphs 1-93 as if fully rewritten herein.

95.     Ohio Rev. Code Section 4112.02 provides, in pertinent part, that:

It shall be an unlawful discriminatory practice:

\*               \*               \*

(J)     For any person to aid, abet, incite, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice ....

96.     In *Genero v. Central Transport, Inc.* (1999), 84 Ohio St.3d 293, 703 N.E. 2d 782 (Ohio 1999), the Ohio Supreme Could ruled that the plain language of Chapter 4112, particularly the definition of "employer", imposes individual liability for discriminatory conduct. Ohio Rev. Code Section 4112.01 (A)(2) defines "employer" to include "any person acting directly or indirectly in the interest of the employer."

97.     Each of the individual Defendants named in this case aided and abetted UD in unlawfully retaliating against Plaintiff, discriminating against Plaintiff, and denying Plaintiff public accommodations.

98.     As a proximate result of the individual Defendants aiding and abetting retaliation, discrimination, and the denial of public accommodations, Plaintiff has suffered damages for which he is entitled to all of the appropriate remedies available to him.

## FIFTH CAUSE OF ACTION
### Sex discrimination in violation of Title IX
### (Against Defendants UD, Bakota, and Zavadil)

21

99.   Plaintiff incorporates by reference Paragraphs 1-98 as if fully rewritten herein.

100.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

101.   UD is covered by Title IX because it receives federal financial assistance for research and development.

102.   Plaintiff's gender is protected by Title IX.

103.   As set forth above, UD, Bakota, and Zavadil discriminated against Plaintiff and denied him certain benefits.

104.   Bakota treated Plaintiff's complaint that a female law student had discriminated and harassed him in violation of UD's policies with deliberate indifference.

105.   As a direct result of Plaintiff's filing his complaint against the female law student, Law School Dean Strauss and his staff kicked Plaintiff out of the Zimmerman Law Library and then banned Plaintiff from using the law library and from visiting the law building until after the female law student, who was the perpetrator of the discrimination and harassment, graduates and completes studying for the Summer bar exam.

106.   Zavadil treated Plaintiff's complaint that UD employees had retaliated against him for filing his complaint against the female law student and for engaging in other related protected activities with deliberate indifference.

107.   As a direct result of Plaintiff's filing his retaliation complaint with Zavadil, UD deactivated Plaintiff's UD gmail account and banned him from visiting UD's campus.

108.   Plaintiff was discriminated against and denied the benefits as set forth above because he is male.

109.   UD, Bakota, and Zavadil's discriminatory conduct violated Title IX's prohibition against discrimination.

22

110. As a result of UD, Bakota, and Zavadil's discrimination, Plaintiff has suffered and continues to suffer humiliation, mental and physical distress and damage.

## SIXTH CAUSE OF ACTION
### Erroneous outcome in violation of Title IX
### (Against UD, Bakota, Schramm, Phelps, and Zavadil)

111. Plaintiff incorporates by reference Paragraphs 1-115 as if fully rewritten herein.

112. UD's employees failed to properly investigate and find merit to Plaintiff's complaint against Jackson because of his male gender.

113. By failing to properly investigte Plaintiff's complaint and by not disciplining Jackson for her misconduct, UD's employees violated UD's policies, Title IX, and the OCR's guidance regarding Title IX.

114. UD's employees exhibited deliberate indifference by refusing to remedy Jackson's violations of the University's policies, Title IX and the OCR's guidance on Title IX.

115. UD and its employees' conduct detailed in this Complaint involved arbitrary and capricious violations of Ohio law.

116. UD and its employees' failure to take prompt corrective action against Jackson in response to Plaintiff's complaint has caused Plaintiff to suffer and continue to suffer damages.

117. UD and its employees' failure to take prompt corrective action against Jackson entitles Plaintiff to injunctive relief because UD's failure to take action against Jackson is unlawful and violates the University's policies, Title IX, and Ohio law. Moreover, UD and its employees failure to act may not be able to be remedied by any award of monetary damages because of the difficulty or uncertainty in proof or calculation.

## SEVENTH CAUSE OF ACTION
### Deliberate indifference in violation of Title IX
### (Against UD, Bakota, Schramm, Phelps, Dunne, Spina, Zavadil, and Recker)

118. Plaintiff incorporates by reference Paragraphs 1-117 as if fully rewritten herein.

119.    UD and its employees exhibited deliberate indifference by: (a) Bakota's failure to conduct an "adequate, reliable, impartial, and prompt" investigation of Plaintiff's complaint against Jackson as required by the OCR's guidance; (b) Schramm's unfounded dismissal of Plaintiff's legitimate concerns about the inadequacy of Bakota's investigation and Jackson's disruptive and disrespectful behavior;
(c) Phelps, Dunne and Spina's rejection of Plaintiff's request that the University mediate his claims;
(d) Zavadil's failure to investigate Plaintiff's retaliation complaint; (e) Zavadil's denial of Plaintiff's request that Dean Strauss' retaliatory and unnecessary ban be removed; (f) Recker's defense of Dean Strauss' ban
On the ground that UD employees were"following standard protocol"; and (g) Recker's denial of Plaintiff's request to have his UD gmail account reinstated on the ground that UD employees were "following standard protocol."

120.    UD and its employees' deliberate indifference caused Plaintiff to suffer and continue to suffer damages.

## EIGHTH CAUSE OF ACTION
### Harassment in violation of Title IX
### (Against Defendants UD, Bakota, Jackson, Strauss, Zavadil, Spina, and Recker)

121.    Plaintiff incorporates by reference Paragraphs 1-120 as if fully rewritten herein.

122.    After Plaintiff filed his discrimination and harassment complaint against Jackson, Jackson asked Interim Title IX Coordinator Bakota to issue a no contact order. On September 26, 2016, Bakota issued a mutual no contact order to both Plaintiff and Jackson.

123.    Based on the factors which the OCR has identified for a school to consider in determining what interim measures to take, Interim Title IX Coordinator Kim Bakota should not have issued the mutual no contact letter. These factors include: "the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and the alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant". Here only a few of these factors apply. As the complainant, Plaintiff did not request a no contact letter. Although Plaintiff considered  Jackson's discriminatory and harassing conduct towards him to be severe and pervasive,  Jackson did not have an opportunity to continue her illegal activities because she dropped Plaintiff's class. Although it is possible that Jackson and Plaintiff may share the law library or be in Keller Hall at the same time, a less restrictive measure could have been taken to address any alleged concerns about their coming into contact with one another.

124.    By granting Jackson's request for a no contact order, Bakota improperly allowed Jackson to play the victim even though she was the perpetrator of the discrimination and harassment.

125.    After Bakota finished her investigation of Plaintiff's complaint, she should have removed the interim mutual no contact letter because it was no longer needed.

126.    On January 10, 2017, over three and a half months after Bakota closed her investigation, Jackson reportedly knew that Plaintiff was in the Zimmerman Law Library and was uncomfortable by his presence. After talking with Associate Dean Shaw, Shaw did not discuss Jackson's concern with Plaintiff in order to discuss a mutually agreeable solution. Instead, Shaw instructed Library Director Elliott to ask Plaintiff to immediately leave the law library without providing him with an explanation for taking this drastic action.

127.    When Plaintiff contacted General Counsel to ask for an explanation, she responded that Dean Strauss was following "standard protocol."

128.    In response to Plaintiff's request for an explanation for why he was kicked out of the law library, Dean Strauss sent the following email message:

> "No one meant to embarrass you which is why Susan Elliott spoke to you privately. However, as you may recall, when you were involved in an equity complaint matter last summer, a no-contact order was issued to you to prevent you from being in contact with the student you brought charges against. **That is standard protocol in such matters**, which protects both parties. Given that the student must attend classes in Keller Hall, study in the law library, and otherwise make use of the facility, your presence in the building makes it difficult to avoid prohibited contacts.Until that Student graduates and finishes summer Bar study, therefore, you may not visit Keller Hall." (emphasis added).

130.    In her first response to Plaintiff's request that Dean Strauss' ban be removed, Title IX Coordinator Zavadil rejected Plaintiff's request echoing Dean Strauss' explanation that **"[i]t is, in fact, standard for no-contact directives to be put in or remain in place following equity inquiries or investigations, as a right afforded to complainants and and respondents in the UD process."** (emphasis added).

123     In her final response to Plaintiff's request that she remove Dean Strauss' ban, Zavadil once again refused to lift the ban but, instead, tried to defend it.

124.    UD's defense that it was just "following its standard protocol" must be rejected for several reasons. Contrary to Recker, Strauss, and Zavadil's assertions, it is not "standard protocol" for a school to issue a no contact order. The OCR Guidelines make it clear that **"[t]he specific interim measures implemented and the process for**

implementing those measures will vary depending on the facts of each case." The OCR's Questions and Answers on Title IX and Sexual Violence, Section G-2, p. 33, emphasis added. Dean Strauss and his staff also focused on the wrong person for protection. "Title IX requires a school to take steps to ensure equal access to its education programs and activities and **protect the complainant as necessary,** including taking interim measures before the final outcome of the investigation." *Id.* at Section G-1, p.32, emphasis added. Dean Strauss placed the burden of the ban on Plaintiff, the complainant, in direct violation of OCR Guidelines. "In general, when taking interim measures, **schools should minimize the burden on the complainant. For example, if the complainant and the alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case."** *Id.* at G-2, p. 33, emphasis added. Here, Dean Strauss did the exact opposite of what is called for in this example. Finally, this situation called for a common sense solution which, if Dean Strauss was unable to recognize, then Associate Dean Shaw - UD's original Title IX Coordinator - or Interim Title IX Coordinator Bakota should have intervened. If Jackson was concerned about running into Plaintiff in either the law library or the law building, all Dean Strauss had to do was to ask both of them not to interact with one another. This would have addressed any alleged concern Jackson might have had without placing the burden of the ban on Plaintiff, the complainant.

125.    The evidence shows that Bakota, Shaw, Elliott, and Zavadil went out of their way to harass Plaintiff to seek revenge against them for filing a complaint against one of their minority law students. This type of revenge is precisely what Section 4112.02 (I) was intended to stop.

126.    UD's defense that it was just "following standard protocol" is reminiscent of the "I was just following orders" defense made famous in the post-World War II Nuremberg trials. This defense did not work for the Nazis at the Nuremberg trials and it should not work for the Defendants in the instant case. Although employees are normally expected to follow their employer's "standard protocols," they should not follow those "standard protocols" when they are asked to perform illegal acts.

127.    As a result of Defendants' harassment, Plaintiff has suffered and continues to suffer humiliation, mental and physical distress and damage.

## NINTH CAUSE OF ACTION
### Negligence
### (Against Defendants UD, Bakota, and Zavadil)

128.    Plaintiff incorporates by reference Paragraphs 1-127 as if fully rewritten herein.

129.    The Department of Education's Office of Civil Rights ("OCR") is responsible for the implementation, interpretation, and enforcement of Title IX. The OCR has promulgated numerous documents outlining the

26

requirements for an educational institution to be in compliance with Title IX, including the April 4, 20111 Dear Colleague Letter ("DCL").

130.    The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

131.    The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with Title IX.  Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action...that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to... (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

132.    The DCL specifically outlines the procedural requirements pertaining to discrimination complaints. Specifically, a recipient of Title IX financial assistance must: "(A) Disseminate a notice of nindiscrimination; (B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX; and (C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints." DCL at p.6.

133.    Regarding "Prompt and Equitable Requirements", the DCL provides, in pertinent part, that:

> OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:
> - Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
> - Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
> - **Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;**
> - Designated and reasonably prompt time frames for the major stages of the complaint process;
> - Notice to parties of the outcome of the complaint;  and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

DCL at p.9, emphasis added.

134.     Regarding "Adequate, Reliable, and Impartial Investigations of Complaints", the DCL specifically states that "**[t]hroughout a school's Title IX investigation,** including at any hearing, **the parties must have an equal opportunity to present relevant witnesses and other evidence."** DCL at p. 11, emphasis added.

135.     Regarding "Notice of Outcome", the DCL requires that "**[b]oth parties must be notified, in writing, about the outcome of both the complaint and any appeal.** DCL at p. 13, emphasis added.

136.     The OCR provided additional guidance in its April 29, 2014 Questions and Answers on Title IX and Sexual Violence ("Q&A's).

137.     The Answer to the question "What elements should a school's Title IX investigation include?" states that **"[i]n all cases, a school's investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence."** Q&A's at p. 25, emphasis added. The Answer also states that "[a] balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions. Specifically:

> - **Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.**
>     *               *               *
> - **Both parties must be notified, in writing, of the outcome of both the complaint and any appeal"**

*Id.* at p.26, emphasis added.

138.     The Answer to the question "Does Title IX protect against Retaliation ?" states, in pertinent part:

> Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. **This means that if an individual brings concerns about**

**possible civil rights problems to a school's attention ... it is unlawful for the school to retaliate against the individual for doing so.**

        \*            \*           \*

**When a school knows or reasonably should know of possible retaliation by** other students or **third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred.**

*Id.* at pp 42-43, emphasis added.

139.    At all the relevant times, Defendants had a duty to take reasonable measures to protect Plaintiff as a UD employee from discrimination, harassment and retaliation.

140.    Defendants, by and through their agents and employees, were acting within the scope of their employment at all relevant times and breached their duty of care to Plaintiff by deviating significantly from the standard of care outlined by the OCR in its 2011 DCL and 2014 Q&A's.

141.    Bakota breached her duty of care by failing to conduct an "adequate, reliable, impartial, and prompt" investigation of Plaintiff's complaint against Jackson. She disregarded Plaintiff's evidence of comparators based on Jackson's admission that she had never asked another law professor to drop an assignment she considered "stupid." Also, Bakota admitted during the October 11, 2016 meeting that she did not interview any of Plaintiff's witnesses.

142.    Zavadil breached her duty of care because after Plaintiff filed his retaliation complaint with her, she did not "take immediate and appropriate steps to investigator otherwise determine what occurred." Instead, Zavadil did nothing. Also, Zavadil refused Plaintiff's request that she remove the retaliatory ban which Dean Strauss had placed on him.

143.    But for the intentional and negligent acts and omissions of Defendants and their violations of the standard of care and Title IX, Plaintiff would not have been injured. Defendants' intentional and negligent acts and omissions therefore amount to negligence.

144.    As a result of UD, Bakota, and Zavadil's negligence, Plaintiff has suffered and continues to suffer humiliation, mental and physical distress and damage.

**TENTH CAUSE OF ACTION**
**Defamation Per Se**
**(Against Bakota)**

145.    Plaintiff incorporates by reference Paragraphs 1-144 as if fully rewritten herein.

146.    Ohio recognizes that certain statements constitute defamation per se. These statements are so egregious that they will always be considered defamatory and are assumed to harm the plaintiff's reputation, without further need to prove harm. Ohio has a broad definition of defamation per se.
Ohio defines the term as any statement that "reflects upon the character of [the plaintiff] by bringing him into ridicule. Hatred, or contempt, or affects him injuriously in his trade or profession." Becker v. Toulmin, 138 N.E. 2d 391, 395 (Ohio 1956).

147.    In the instant case, Bakota engaged in defamation per se when, in her October 3, 2016 memo to Schramm and Monk, she tried to falsely portray Plaintiff as a racist by falsely attributing racist statements to Plaintiff which he never made. As discussed above, Plaintiff never told Bokata that "Jackson was having a 'N moment in his class" or that he told Jackson that "she would be failing her race if she didn't do her best."

148.    Bakota made these defamatory statements about Plaintiff with actual malice and reckless Disregard of their falsity, or with knowledge of their falsity.

149.    As a result of Bakota's defamation, Plaintiff suffered and will continue to suffer damages.

### EIGHTH CAUSE OF ACTION
### Promissory estoppel against Defendants UD, Phelps, and Recker

150.    Plaintiff incorporates by reference Paragraphs 1-149 as if fully rewritten herein.

151.    The doctrine of promissory estoppel is intended to stop a promisor from arguing that an underlying promise that was made should not be legally enforced. Promissory estoppel arises when a defendant makes "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance.'" *Hortman v. Miamisburg,* 110 Ohio St. 3d 194, 2006 Ohio 4251, Paragraph 23, 852 N.E. 2d 716, quoting Restatement of the Law 2d, Contracts, Section 90, at 242 (1981).

152.    To prove a claim for promissory estoppel, a plaintiff must prove: (1) a clear, unambiguous promise; (2) that the person to whom the promise was made relied on the promise; (3) that reliance on the promise was reasonable and foreseeable; and (4) that the person claiming reliance was injured as a result of reliance on the promise.

153.    Plaintiff can establish these elements regarding his Forced Labor Project stipend.
On January 13, 2017, Professor Mark Ensalaco offered Plaintiff a Research Fellow position to work on his Forced Labor Project. In his offer, Ensalaco promised to pay Plaintiff a $5,000 stipend plus $3,000 for travel expenses to

Washington, D.C. and to other locations. Ensalaco indicated that he needed Plaintiff "to begin research early in this semester (viz ASAP)." Plaintiff accepted Mark's offer and in reliance of his promised compensation Plaintiff invested more than $5,000 worth of his time (calculated at his normal hourly rate of $350) doing legal research, meeting with Ensalaco and Research Fellow Alex Mingus, and drafting a white paper advocating that Congress amend the Foreign Corrupt Practices Act (FCPA) to include a ban on the purchase and sale of products made with forced labor. Plaintiff's reliance on Ensalaco's promise was reasonable because since Plaintiff started work on the Project, Ensalaco encouraged Plaintiff and offered suggestions about Plaintiff's proposed legislative advocacy strategy. Finally, Plaintiff was injured as a result of his reliance on Ensalaco's promise that he could make arrangements for Plaintiff's $5,000 stipend to be paid in a lump sum  because Plaintiff had promised Brad Kirkwood of Kirkwood Heating & Cooling that he would use the stipend money to pay his bill for
Emergency replacement of Plaintiff's furnace in his home.

154.     Plaintiff can also establish the promissory estoppel elements regarding his Adjunct Faculty Training Workshop stipend. The Learning Teaching Center (LTC) emailed Plaintiff an invitation to attend the February 18, 2017 workshop promising to pay a $50 stipend for attending. In reliance on this promise, Plaintiff attended and participated in the 3-hour workshop. Plaintiff's reliance on the LTC's promise was reasonable and foreseeable. Plaintiff has been injured because the LTC did pay Plaintiff the $50 stipend he earned.

155.     Phelps instructed Beth harrison from the LTC not to pay Plaintiff the $50 stipend Plaintiff was promised for attending the LTC workshop. Upon information and belief, Phelps was also responsible for Ensalaco's failure to make good on his promise to pay Plaintiff his lump sum $5,000 stipend.

156.     After Plaintiff sent Phelps a letter demanding payment of the two stipends, General Counsel Recker responded disputing Plaintiff's promissory estoppel claims.

157.     As a proximate cause of UD, Phelps, and Recker's failure to pay Plaintiff the two stipends he was promised and earned, Plaintiff has suffered damages for which he is entitled to all of the appropriate remedies available to him.

**NINTH CAUSE OF ACTION**
**Breach of an implied contract**
**(Against Defendant UD)**

158.     Plaintiff incorporates by reference Paragraphs 1-157 as if fully rewritten herein.

159.     Ohio courts recognize implied contract as an exception to the employment-at-will doctrine. Whether explicit or implicit contractual terms have altered an at-will-employment agreement depends upon the history of the

relations between the employer and employee, as well as the facts and circumstances surrounding the employment relationship. *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St. 3d 571, 574, 1995-Ohio-114, 653 N.E. 2d 381. The relevant facts and circumstances include "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question * * *." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), paragraph two of the syllabus. *See also Kelly v. Georgia-Pacific Corp.*, 46 Ohio St.3d 134, 545 N.E.2d 1244 (1989), paragraph two of the syllabus.

160.    The attached copies of UD's Nondiscrimination and Anti-harassment Policy, Mandatory Reporting Policy, and Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and other Forms of Harassment constitute an implied contract of employment.

161.    UD's policies do not contain employment -at-will disclaimers that would preclude Plaintiff's use of these policies to demonstrate an implied contract of employment.

162.    Plaintiff can establish all the elements for a breach of an implied contract of employment claim because: (1) he had an implied contract of employment; (2) he performed his obligations under this contract; (3) UD materially breached the contract; and (4) plaintiff has suffered damages.

163.    As a result of UD's breach of Plaintiff's implied contract of employment, Plaintiff  has suffered and continues to suffer damages for which he is entitled to all of the appropriate remedies available to him.

### TENTH CAUSE OF ACTION
### Misrepresentation and fraud
### ( Against Defendant UD)

164.    Plaintiff incorporates by reference Paragraphs 1-163 as if fully rewritten herein.

165.    In its Nondiscrimination and Anti-harassment Policy, Mandatory Reporting Policy, and Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and other Forms of Harassment, UD made representations to all of its employees, including Plaintiff, that UD would protect them against retaliation, discrimination, and harassment.

166.    UD's "Commitment to Community", which highlights three principles adopted from the Catholic and Marianist vision of education, shapes UD's policies. The three principles - "the dignity of every person", "the common good", and "community is essential for learning" - provide the foundation of UD's mission statement and aims as an educational institution. The influence of these principles can be found throughout the University's policies, behavioral expectations for students, and academic curriculum.

167.    UD's representations were falsely made, with either knowledge of their falsity, or with disregard as to whether they were true or false.

168.    UD, through its employees, has committed the tort of intentional misrepresentation under Ohio law.

169.    UD, though its employees, has also committed the tort of fraud under Ohio law.

170.    As a result of UD's intentional misrepresentation and fraud, Plaintiff has and continues to suffer damages for which he is entitled to all of the appropriate remedies available to him.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against UD and the individual Defendants as follows:

(a)    Order requiring UD to rehire Plaintiff to a tenured professor position teaching the classes he has taught in the past and where he would be protected from future acts of retaliation, discrimination, and harassment.

(b)    Pay Plaintiff back pay for the six classes he would have taught but for Defendants' retaliation, discrimination, and harassment.

(c)    Cover all of Plaintiff's expenses to attend the Designing Your Life (DYL) teacher workshop at Stanford University and schedule Plaintiff to teach UD's version of the DYL course starting in the Fall, 2017 semester.

(d)    For actual, special, and compensatory damages in an amount to be determined at trial but in no event less than $75,000.

(e)    For punitive damages in an amount sufficient to deter UD and its employees from engaging in similar retaliatory, discriminatory, and harassing conduct in the future but in no event less than $100,000.

(f)    Order UD to expunge Plaintiff's official personnel file and any and all other files kept on Plaintiff related to the retaliatory, discriminatory, and harassing actions the individual Defendants took against Plaintiff.

(g)     Order all of the individual Defendants to attend remedial training on what constitutes unlawful
        retaliation, discrimination, and harassment under federal and Ohio law and
        what preventive measures they need to take to avoid engaging in such illegal activity.

(h)     Order Bakota, Schramm, Phelps, Strauss, Zavadil, and Recker to attend remedial training regarding
        what a  Title IX coordinator's responsibilities are, what elements a school's Title IX investigation
        should include, how a school should determine whether to take interim measures before the
        completion of its investigation, and how to satisfy the OCR's
        guideline that "a school's Title IX investigation must be adequate, reliable, impartial,
        and prompt and include the opportunity for both parties to present witnesses and
        other evidence.

(i)     Pre-judgment interest and post-judgment interest.

(j)     Attorneys' fees and costs.

(k)     Such other and further relief as this Court may deem just, proper, equitable, and
        appropriate.

Dated:  May 19, 2017                                /s/ Peter K. Newman
                                                    Peter K. Newman (0010468)
                                                    **The Newman Law Group LLC**
                                                    594 Garden Road
                                                    Dayton, OH 45419
                                                    Ph: 937.475.6282
                                                    Email: newmanlawgroup@gmail.com

                                                    *Attorney for Plaintiff*

## JURY DEMAND

_____Plaintiff demands a trial by jury

                                                    /s/ Peter K. Newman
                                                    Peter K. Newman (0010468)

34